[843 NYS2d 51]

CANNON POINT NORTH, INC., Appellant, v CITY OF NEW YORK et al., Respondents.

First Department, October 9, 2007

APPEARANCES OF COUNSEL

*Bracewell & Giuliani, LLP*, New York City (*Daniel S. Connolly, Rachel B. Goldman* and *Daniel S. Meyers* of counsel), and *Law Offices of Michael B. Wolk* for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*John Hogrogian, Pamela Seider Dolgow, Robin Green* and *Paula Van Meter* of counsel), for municipal respondents.

*Andrew M. Cuomo, Attorney General*, New York City (*David Lawrence III* and *Robert H. Easton* of counsel), for state respondents.

### OPINION OF THE COURT

BUCKLEY, J.

Plaintiff is the owner of the premises known as 25 Sutton Place South, part of which building rests upon a platform above the northbound and southbound roadways of the FDR Drive between East 54th Street and East 56th Street; two other buildings, public parks, and private gardens also rest on the structure, which plaintiff terms the FDR roof structure and defendants refer to as the understructure of plaintiff's building. At issue is who owns that structure, and thus, who is responsible for its maintenance and repair.

In 1936, the first segment of the FDR Drive, then known as the East River Drive, was put into service, from the terminus of

the Triborough Bridge at East 125th Street to East 92nd Street. In 1938, the Board of Estimate resolved to extend the Drive to East 49th Street. The Board authorized the taking of fee title to that segment, except for East 54th to 56th Street, where "a permanent easement for street purposes" would be acquired, "together with permanent easements in the land required for foundations and supports of the highway . . . excluding from said easements column rights, which shall not exceed 18 inches in width and shall not be located at intervals of less than 15 feet in the centrally located mall spaces." From 55th to 56th Street, the easement was to have an elevation of 36 feet. The purpose of these easements was "to permit the owner of the abutting property to construct buildings over the highway and thereby obviate large claims for consequential damages," and therefore it was "necessary to reserve to the owner of the abutting property column rights in the 4-foot centrally located mall space, shown on the layout map."

In March 1939, Supreme Court granted the City's condemnation petition, but reserved for future hearings the issue of just compensation to the property owners. The condemnation order's description of the property, including the easements, matched that of the resolution.

In October 1939, Supreme Court granted the City's petition to add to its taking "title to the buildings and structures, above elevation 36.0 feet . . . , as existing on June 28, 1939, between East 55th street and East 56th street."

During the hearing on just compensation, the City and the property owner at the time, the Henry Phipps Estates (HPE), agreed to slightly modify the easement to "a somewhat less area than originally planned, which will enable the property owner to make use of the area above the plane taken by the easement." At the conclusion of the hearing, Supreme Court set the just compensation for the easement for East 55th to 56th Streets at $336,757, comprised of $191,200 for "[d]amage by reason of easement," $80,557 for "[a]dditional foundations," and $65,000 for "improvements."

The "[a]dditional foundations" award reflected the extra amount the property owner would have to spend to erect foundations to support a building spanning the Drive, "over and above" the cost of normal foundations that could be constructed if the Drive did not exist. The amount assigned to the additional foundations was made "on the assumption that the owner will have the right to erect [its] foundations on the

easterly and westerly walls of the subway structure, and also on the mall in the center of the [Drive] structure," and that it would be "permitted to perform the work during the day time and not at night." A subsequent order stated that the damage awards had been made upon:

> "the assumption that the owner will have the right to use the East River Drive structure as a foundation for part of any buildings to be erected thereon. If this right is not given, then permission is granted to reopen this proceeding for the purpose of giving any additional damages that may be established by reason of such failure and refusal."

The second segment of the Drive, from 92nd to 49th Street, was opened in 1940. At that time, there was no cover over the easement at issue.

In 1941, the City and HPE executed an indenture that closed and discontinued parts of the City's easement, along the west wall, central mall foundations and column area, east wall foundations and column area, and certain additional foundation areas, because:

> "it was intended by the parties . . . that [HPE], in addition to the column rights reserved to it in the centrally located mall, should have the right to utilize parts of such easement on the east and on the west and additional parts in the said centrally located mall, for the purpose of erecting and maintaining columns and foundations in connection with the erection and maintenance of buildings over and across the easement; but the resolutions heretofore adopted by the Board of Estimate did not reserve to [HPE] the right so to do."

HPE agreed to erect its columns at certain uniform spacings, "and to restore or replace any roadways, parapets, granite facings, walls, curbs, and any other appurtenances, or structures damaged or removed in said erection." In addition, HPE granted to the City

> "a permanent easement to maintain, repair, or replace parapets, walls and foundations located within the parts of [the] easement to be closed and discontinued, subject, however, to the right of [HPE] to erect and maintain its columns and foundations therein and thereon, and provided that such main-

tenance, repair or replacement shall not interfere with or damage any structures hereafter erected by [HPE]."

In 1957, it was discovered that the City had inadvertently omitted from the condemnation maps any upper limit to the easement, and the Board of Estimate therefore approved a new map, limiting the elevation of the City's easement to 36 feet, in conformity with the 1939-1941 agreements, Board resolutions, and court orders, so that construction of buildings over the Drive could proceed.

On June 6, 1957, the lessees of the property from HPE entered into an agreement with the City pursuant to which the lessees promised: "To so perform their work of borings, installing foundations, erecting columns and beams, and erecting their buildings as not to endanger the stability of the roadway of the . . . Drive . . . and its appurtenant structures, and [to] replace any portions thereof which are disturbed or affected by such work." The lessees agreed to a particular work schedule for the "erecting of its steel for the cover deck . . . within and immediately abutting the highway easement." They further undertook to provide "at their own cost and expense, all necessary anchor bolts, electrical conduits, electrical pull boxes, wall and ceiling chases and niches, required by the City for the future installation of the permanent roadway lighting and ventilation systems and the necessary anchorages in the walls for the future installation of panels or tiles." The lessees would also submit to the Manhattan Borough President, for prior approval, plans for "maintenance operations which may interfere with vehicular traffic."

Construction of the subject building was completed in 1959; plaintiff acquired title in 1973.

Inspections of the Drive conducted in 2002 and 2003, at the behest of the City, revealed cracks in the concrete above the Drive and below plaintiff's building and in columns along the Drive, which posed a danger of concrete falling onto passing vehicles. The City Departments of Buildings and Transportation directed plaintiff to correct the conditions, but plaintiff refused on the ground that it was the City's responsibility. The City retained a contractor to effect the repairs, which allegedly cost $295,142.

Thereafter, plaintiff commenced this action seeking, inter alia, a declaration that the "FDR Roof Structure," consisting of "a structure supported by columns, walls and related safety-

devices extending down to and interconnecting with a paved portion of the [Drive]" is public property, which the city and state defendants are exclusively responsible for maintaining and repairing.[1]

The city defendants[2] counterclaimed for (1) a declaration that plaintiff is the owner "of the entire understructure [of its premises], including but not limited to the foundation, columns, deck and other supporting structures," (2) a declaration that plaintiff is responsible for the maintenance and repair of that understructure, and (3) damages in the amount of $295,142 for the amount allegedly expended to effect emergency repairs.

Plaintiff asserted as an affirmative defense to the second and third counterclaims that the City's conduct in salting the Drive was the primary cause of the deterioration of the structure over the Drive.

After discovery, the city defendants moved for summary judgment dismissing the complaint and for judgment on their first and second counterclaims; the state defendants also moved for summary judgment dismissing the complaint. Plaintiff cross-moved for, inter alia, partial summary judgment on its cause of action for a declaration that defendants bear responsibility for the maintenance and repair of the structure over the Drive.

As set forth more fully, *supra*, the Board of Estimate resolutions, the Supreme Court condemnation and compensation orders, the 1941 indenture, and the 1957 agreement all expressly reserved to the property owner (and/or its lessees), plaintiff's predecessor in interest, the right to construct columns and foundations within the Drive in order to support a building above and across the roadway. The owner's columns and foundations were specifically excluded from the City's easements, and the owner was paid an "[a]dditional foundations" award to compensate it for the added expenses of erecting a building over the easements. Plaintiff argues that an ambiguity is created by the 1941 indenture, which provided that the City would have:

> "a permanent easement to maintain, repair, or replace parapets, walls and foundations located

---

1. The State of New York and the State Department of Transportation were named as defendants because they possess the right, pursuant to Highway Law §§ 349-b and 349-d, to take over control of the Drive from the City upon completion of a substantial renovation project along the entire Drive.

2. The City of New York and its Departments of Transportation, Buildings, and Housing Preservation and Development.

within the parts of [the] easement to be closed and discontinued, subject, however, to the right of [HPE] to erect and maintain its columns and foundations therein and thereon, and provided that such maintenance, repair or replacement shall not interfere with or damage any structures hereafter erected by [the owner]."

Contrary to plaintiff's assertions, the indenture does not raise an issue of fact whether the City is responsible for maintaining the bottom of the structure above and across the Drive or the columns supporting that structure. The City was granted an additional easement to "maintain, repair, or replace parapets, walls and foundations located within [parts of the easement]," but that right was made subject to the owner's right to "erect and maintain its columns and foundations," and the City's repairs were not to "interfere with or damage any structures hereafter erected by [the owner]." Since the City was not to interfere with any structures erected by the owner, there is no basis to find a general duty on the part of the City to maintain the owner's structures. The City's repair easement makes no mention of columns or structures above the Drive. In fact, the indenture made a distinction between walls, parapets and the City's foundations, which the City was to maintain, and columns and "its [the owner's] . . . foundations," for which the owner would be responsible.

The fact that the owner of the property was not given an additional award to defray the cost of future repairs of its columns and foundations does not render the clear allocations of ownership rights and maintenance responsibilities ambiguous. If the owner felt the condemnation award was inadequate, the time to contest it was during the damages hearing or, at the latest, when the 1957 agreement was negotiated.

Similarly misplaced is plaintiff's reliance on general descriptions of the Drive in the Supreme Court condemnation and compensation orders as a highway with overhead structures or covers over certain portions. Plaintiff's interpretation, that all overhead structures on the Drive are part of the City's easement, would render meaningless the detailed descriptions regarding the structure to be built by HPE, including the spacing and size of supporting columns, and the height limitation of the City's easement.

Another isolated statement relied on by plaintiff is the condemnation court's acknowledgment that HPE would "have

the right to use the East River Drive structure as a foundation for part of any buildings to be erected thereon." The lack of a definition of "Drive structure" is immaterial, since the orders, resolutions, agreements, and maps specify which foundations and structures each party is responsible for.

According to plaintiff's structural engineer, Richard Zottola, underneath the building is a separate structure, a "transfer platform," that is supported by columns distinct from the building's columns. He asserts that the transfer platform "does not have a significant structural engineering function for the apartment building." He states, without elaboration, that the City would not have allowed the base of the building to serve as the roof of the Drive, and would have required some intermediary structure, between the building and the Drive. Therefore, he opines that the primary purpose of the transfer platform is to provide a ceiling for the Drive. Zottola speculates that the transfer platform was constructed before the building, and based on that assumption and the platform's purported purpose of serving as an intermediate roof structure, he hypothesizes that the City built it.

Although Zottola asserts that the transfer platform is a separate and distinct structure, he also states that its girders "are located to support the columns of the residential tower" and that a portion of the building's steel superstructure "rests on top of the transfer platform," all of which would indicate that the platform is part of the apartment building structure. Moreover, the transfer platform is included in the construction plans submitted to the City by the owner, as part of the overall project, thus indicating that the owner erected it. Even more telling is Zottola's admission that the bottom of the transfer platform is four inches above the City's 36-foot vertical easement, which places the structure within the owner's zone of responsibility. If it was the City's duty to build the transfer platform, then there would have been no reason for HPE's lessees to promise in the 1957 agreement "[t]o provide in their construction work, at their own cost and expense, all necessary . . . ceiling chases and niches, required by the City for the future installation of the permanent roadway lighting and ventilation systems."

In light of such evidence, the surmises of plaintiff's expert are insufficient to raise a triable issue of fact regarding who built the transfer platform (*see Piluso v Bell Atl. Corp.*, 305 AD2d 68, 70 [2003]). Indeed, in its reply brief, plaintiff embraces the view that HPE erected the transfer platform and would even have

the right to maintain the roof over the Drive, although plaintiff also contends that the City would bear the ultimate responsibility for maintenance.

In all the cases on the doctrine of appurtenance cited by plaintiff (*see Heyert v Orange & Rockland Util.*, 17 NY2d 352 [1966]; *Thompson v Orange & Rockland Elec. Co.*, 254 NY 366 [1930]; *Palmer v Larchmont Elec. Co.*, 158 NY 231 [1899]; *Eels v American Tel. & Tel. Co.*, 143 NY 133 [1894]; *Holden v City of New York*, 6 AD2d 872 [1958], *affd* 7 NY2d 840 [1959]; *Dutcher v Town of Shandaken*, 23 AD3d 781 [2005]; *Ferguson v Producers Gas Co.*, 286 App Div 521 [1955]), the easement possessor sought to expand its easement to erect certain structures; none stands for the proposition that a private owner can unilaterally expand a municipality's easement or force upon the municipality responsibility for a structure which the owner itself built. The City's attachment of road signs to the "transfer platform" does not constitute a de facto taking of the entire edifice.

Based on the foregoing, the city defendants are entitled to summary judgment on their first counterclaim, for a declaration that plaintiff is the owner of the understructure of its building, including but not limited to the building's foundation, deck, and supporting columns and structures.

However, Supreme Court erred in granting the city defendants summary judgment on their second counterclaim, for a declaration that plaintiff is responsible for the maintenance and repair of the understructure of its building, including but not limited to the foundation, deck, and supporting columns and structures.

Plaintiff's structural engineer, having examined the understructure, opines that the deterioration of its concrete and steel is due primarily to long-term exposure to road salts and other deicing substances applied by the city defendants to the Drive, which corrosive elements are absorbed by water and made airborne by automobile traffic. Whether viewed as tortious or a violation of the 1941 agreement not to damage plaintiff's structures, those deicing actions, and any other debilitative causes attributable to the city defendants, would warrant the imposition of liability on the city defendants for repairs, in whole or in part, depending on the extent to which those actions have damaged the structures. Contrary to Supreme Court's findings, the affirmative defense pertaining to the city defendants' maintenance and control over the roadway is relevant not only to the city defendants' third counterclaim (for

reimbursement of their expenditures for emergency repairs thus far), but also to the second counterclaim, and plaintiff's own claims, for a declaration as to which party is responsible for repairs and maintenance.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Saralee Evans, J.), entered March 24, 2005, which granted the city defendants' motion for summary judgment on their first and second counterclaims for declaratory relief, declared that plaintiff is the owner of the understructure spanning the FDR Drive, over which its building is partially built, "including but not limited to the foundation, deck, columns and other supporting structures thereof," and is responsible for its repair and maintenance, dismissed the complaint, denied plaintiff's cross motion for summary judgment, and severed and continued the municipal defendants' third counterclaim, to recover the $295,142 they allegedly expended in emergency repairs to the understructure, unanimously modified, on the law, to deny that part of the city defendants' motion for summary judgment on their second counterclaim, vacate the declaration that plaintiff is responsible for the maintenance and repairs of the understructure of its building, reinstate the complaint, and the matter remanded for further proceedings consistent herewith, and otherwise affirmed, without costs.

MAZZARELLI, J.P., FRIEDMAN, CATTERSON and MALONE, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered March 24, 2005, unanimously modified, on the law, to deny that part of the city defendants' motion for summary judgment on their second counterclaim, vacate the declaration that plaintiff is responsible for the maintenance and repairs of the understructure of its building, reinstate the complaint, and the matter remanded for further proceedings consistent herewith, and otherwise affirmed, without costs.